GEORGE COLLIER, ET AL, VS. CHARLES H. VALENTINE, WHO SUES TO THE USE OF THE ST. LOUIS INSURANCE COMPANY.

1. In an action against a carrier, on a bill of lading, for a loss of freight, although it appear that his boat was not seaworthy, it is yet competent for him to shew that the loss was in fact occasioned by the excepted perils of the river, and not by the unseaworthiness of the boat. Although a carrier may be in default, yet if the loss were not occasioned by his default, but must have happened without such default, he is not liable.

2. The rule which imputes carelessness to a captain whose boat strikes a known rock or shoal, unless driven by a tempest, is only applicable to the navigation of the ocean, where the rocks and shoals are marked upon maps and may be avoided—and does not apply to the navigation of our rivers. In such navigation, each case must be governed by its own circumstances, and be tested by the course usally pursued by skilful pilots in such cases.

## APPEAL from St. Louis Circuit Court.

### Statement of the Case.

Valentine brought an action on the case for the use of the St. Louis Iusurance Company, against Collier and others, the appellants, to recover the value of fourteen casks of bacon, shipped by Valentine on the steamboat Oregon, (of which the defendants were owners,) on a voyage from St. Louis to New Orleans.

The Oregon, in a previous voyage from New Orleans, had broken a shaft, at about midway between New Orleans and St. Louis, and had come up with one wheel. As she was then partly loaded for Quincy in Illinois, she went on to that place with that part of her freight, using but the one wheel. Having discharged her cargo there, she returned, taking in, in her way down the river, at different places, freight for New Orleans. When she arrived at St. Louis, she had the

principal part of her load aboard, and took in the remainder at St. Louis, among which was the plaintiff's bacon.

While the boat remained at St. Louis, a new shaft in place of that which had been broken, was put in, and the arms of the wheel on which the buckets are fastened were also put in, but the buckets themselves were not put upon the wheel, with the exception of three iron buckets, which are called the counterbalance. The boat being in this condition, with one wheel complete, and the other having the arms and the counterbalance buckets, but not the common wooden buckets, being heavily loaded, and the river falling, the captain judged it safest for all interested that she should leave St. Louis without waiting to have the wheel filled, as it is termed, with a complete set of buckets. He accordingly applied to the officers of different Insurance Companies for their permission to start in the then condition of the boat. Such permission was given by one office, but there is no evidence that the St. Louis Insurance Company consented. The Captain finally determined to start, and did actually start, without the buckets being on the one wheel.

About fifty miles below St. Louis, the boat ran with her bow against a sand bar, and by the force of the current, immediately swung round. In swinging, the side of the boat, near the stern, or between the after hatch and the stern post, struck a snag, which tore a hole in her, and then she swung over the snag up against the bar. The boat and much of the cargo, including the plaintiff's bacon, was lost.

The place at which the vessel struck, was a narrow channel, with a bar on one side, and a swift current, in which were many snags, on the other. The captain, who also acted as pilot, was at the wheel when the accident occurred, and was reputed to be one of the best pilots on the river. The testimony shows, that the boat was in the channel, but bearing to the right to avoid the snags, the bow struck the bar, and then the swinging became inevitable, and the loss was the necessary consequence.

Evidence was given to show that a boat in the condition of the Oregon might, in some circumstances, be less manageable than if she had both wheels complete, and might be extricated from difficulties with greater ease. So, also, it was stated in general terms, by some of the witnesses, that with one wheel without buckets, the boat was not seaworthy.

On the other hand, the pilot (Burke) who steered her from St. Louis to within a few miles of the place at which she sunk, and who appeared by the evidence to be entirely competent, testified that when he turned her from the shore at St. Louis, he used the wheel that at the trial was called the disabled wheel, and he did not then know, either by the working of the wheel or otherwise, that there was any defect in the wheel. He had been told by the captain, the day before, that he had a broken wheel and would be detained a day in order to repair it; but when he went on board to start, nothing was said to him by the captain about the wheel, and he supposed it had been repaired. He also stated, that there was no difficulty in steering the boat—that she obeyed her helm and ran wherever he desired her to go—that in a gale of wind, which she encountered the evening she left St. Louis, she was entirely manageable, and at one time, when it became necessary to back her off from some rocks which she was approaching too closely, it was done with the wheel which had not been filled, and done without difficulty. The testimony of this witness was strong to show that in running down the river at that time, the Oregon was in a condition in which she could with ease be steered wherever the pilot thought proper.

There was testimony given by different witnesses on the question whether it was practicable to prevent a boat from swinging, when in going down stream she ran her bow upon a bar, and the weight of the testimony, as given upon the trial, is, that no condition of the wheels and no number of wheels can prevent the stern being carried around by the force of the current when the bow is upon a bar, unless the boat should have run so far upon the bar as to be entirely fast for a great part of her length.

Testimony was also given as to the practice among captains of boats in taking off a portion of the buckets on the wheels, and in removing buckets higher up the arms, when the boat is heavily laden, so as to diminish the surface acting upon the water. This testimony was intended to show

that the Oregon, heavily laden, running down stream in low water, when the officers dare not run fast, was in a proper condition to be navigated without buckets on the wheels, as the arms themselves gave a sufficient surface to act on the water.

The general scope of much of the testimony was to show that the alleged unseaworthiness of the boat did not in any degree contribute to produce the disaster, but that the boat ran where it would have gone if both wheels had have been perfect—that the striking of the bar was from no want of skill or care, and that when she struck, the swinging and the loss were inevitable. It is not thought necessary to encumber this statement of the case with a detail of the testimony of the different witnesses, as the questions which are now to be considered do not depend upon any very critical examination of the testimony. Evidence was given to show that Valentine's interest in the bacon shipped on the boat, was fully insured in the St. Louis Insurance Company and that after the loss occurred, that corporation, with a full knowledge of the facts in relation to the condition of the boat, adjusted the loss on the bacon and paid the amount. This action is prosecuted for the benefit of that company.

The bill of lading was for the delivery of the bacon in New Orleans, "unavoidable dangers of the river, and fire, only excepted."

The evidence being closed, the court gave to the jury, the following instructions :

If the jurors believe from the evidence that the plaintiff was the owner of the property in question, and that he delivered the same to the master, clerk, or other persons employed in the navigation of the steamboat Oregon, for the purpose of being transported on the said boat for hire to the port of N. Orleans, and that the said defendants at the time were the owners or part owners of the said boat—and if the jurors shall also believe from the evidence that the said property, after such delivery, became lost to the plaintiff, they will find the issue for the plaintiff, unless the jurors shall also be satisfied from the evidence that said property was lost by the unavoidable accidents, one or more, of the river.

If the jurors believe from the evidence that the plaintiff was the owner of the property in question, and that he delivered the same to the master, clerk, or other persons employed in the navigation of the said boat, for the purpose of being transported for hire upon the said boat to the port of New Orleans, and that the said defendants, at the time, were the owners or part owners of the said boat—and if the jurors shall believe also from the evidence that the said boat, at the time of starting on said voyage with the said property, was not tight, staunch, and suitably equipped for said voyage, with proper officers and with a proper crew, and if they shall also believe from the evidence that the said property, after such delivery, became lost to the plaintiff, they will find the issue for the plaintiff.

If the property of the plaintiff was received on board the steamboat Oregon at St. Louis, to be carried thence to New Orleans—that said boat was at the time unseaworthy, and might have been rendered seaworthy before her departure—that she departed on the voyage while unseaworthy, with said property on board—that the said property was lost or damaged during the voyage and before the defects in the vessel were remedied, the owners of the boat are liable for such loss or damage.

If the jury shall believe from the evidence that the construction of the "Oregon" was such as to require two paddle wheels, and that she departed on the voyage in the declaration mentioned with only one of said wheels complete, she was unseaworthy.

If property of plaintiff was shipped on board the "Oregon" at St. Louis, to be carried on board thereof to New Orleans for hire—that said property was lost or damaged on board said boat, during that voyage—then the owners of said boat are liable for loss or damage, unless it appears to the satisfaction of the jury to have been occasioned by unavoidable accidents, one or more, of the river, and without any fault or negligence of the owners, masters, officers or crew of the boat, or either of them.

If property of the plaintiff was shipped on board the steamboat "Oregon," at St. Louis, to be carried for hire on board thereof to New Orleans; that said boat departed on said voyage with the

said property on board in an unseaworthy condition, and loss or damage happened to said property while the boat remained unseaworthy, the owners of the boat are liable for such loss or damage, unless it is proved to the satisfaction of the jury that such loss or damage was not occasioned by such defect, nor by the fault or negliffence of the master, officers and crew, or either of them.

If the jurors shall believe from the evidence that the said boat was sunk and the said property lost or damaged thereby, and that the sinking of said boat was in consequence of its grounding on a bar or striking a snag, or both—and if the jurors shall also believe that the existence of the said bar and snag was known to the master and pilot of said boat, or to either of them, or that the existence of said bar and snag was generally known to skilful pilots and navigators of steamboats upon the Mississippi river; and if they shall also believe from the evidence that the said steamboat Oregon, at the time of starting upon the said voyage, and at the time of sinking, was in an unseaworthy condition—then, and in such case, the loss or damage which happened to the said property by reason of the striking of the said boat, is not within the exception contained in the bill of lading, and is not a loss or damage by the unavoidable accidents, one or more, of the river, and the jurors will find the issue for the plaintiff, unless they shall, at the same time, believe from the evidence that the said boat was driven upon the said bar or snag, or both, by sudden adverse winds or tempest.

And if the jurors shall believe from the evidence that the sinking of the Oregon was in any degree occasioned by the unseaworthiness of said boat, existing at the commencement of her said voyage, or by the rashness, ignorance or unskilfulness of her master or pilot, the loss or damage to the plaintiff's property is not within the exemption contained in the bill of lading.

If the jurors believe from the evidence that at the time the said property was delivered to the master, clerk, or other person employed in the navigation of the said boat, to be transported on said boat to the port of New Orleans, the said boat was tight, staunch, and suitably equipped for said voyage, with proper officers and with a proper crew, and if the jurors shall also believe from the evidence that the said property was lost by the unavoidable accidents, one or more, of the river, they will find for the defendants.

The court also refused to give to the jury the following instructions, asked to be given by the defendants, viz:

That the plaintiff is not entitled to recover in this case, unless it appears to the satisfaction of the jury, either that the loss of the plaintiff's goods was occasioned by the defects in the Oregon, or the negligence of the officers or crew.

That if the jury find from the evidence that the St. Louis Insurance Company, after the loss on the Oregon, with knowledge of all the facts connected with that loss, and of the condition of said boat at the time she started from St. Louis, adjusted the loss of Taylor & Ferguson on the insurance effected by them with said company on the property of Valentine, the plaintiff, to the amount of advances made by them to Valentine on said property, and paid said loss to said Taylor & Ferguson, without any condition, and in satisfaction of the claim of Taylor & Ferguson on said Valentine, then the said plaintiff cannot recover in this action for the amount so paid.

If the jury should find from the evidence that the steamboat Oregon was not seaworthy at the commencement of the voyage from St. Louis to New Orleans, still the defendants are not liable for the loss of the plaintiff's goods, if such loss was occasioned by the unavoidable dangers of the river and not contributed to by the unseaworthiness of the boat.

That the plaintiff is not entitled to recover on the first count of the declaration, unless he has proved to the satisfaction of the jury that the loss of his goods was occasioned by the unseaworthiness of the steamboat Oregon, or that such unseaworthiness contributed to the loss.

That the plaintiff is not entitled to recover on the second count of the declaration, unless it appears to the satisfaction of the jury that the plaintiff's goods were lost by the negligence of the persons employed on the Oregon.

A verdict having been rendered for plaintiff for the amount of his bacon, the defendant moved for a new trial, which was refused.

*Geo. Collier, et al, vs. Chas. H. Valentine, who sues to the use of the St. Louis Insurance Company.*

## GAMBLE & BATES, *for Appellants.*

1. It is admitted, that in every case of shipment, whether there be a bill of lading or not, a contract is implied on the part of the owner that his vessel is staunch and sufficient for the voyage contemplated, and is provided with competent officers and crew. Lyon vs. Mills, 5 East. R., 429; Story on Bailments, secs. 509, 571, 592; Abbott on Shipping, 218; 3 Mass. R., 481.

2. It is admitted, that whether there be a bill of lading or not, the owners of the vessel are liable for any damage which may happen to the cargo by reason of the violation of the implied contract to furnish a vessel and crew suitable for the voyage. The above cited authorities show this to be the law.

3. The seaworthiness required of the owner has respect to the service in which it is proposed to employ the vessel. 1 Phillips on Insurance, 309, 311, 312, 315; Annis vs. Stevens, 1 Stra., 128.

4. It is admitted that common carriers, who carry goods for hire and who have no contract limiting their responsibility, are only excused for the non-delivery of the goods by the act of God or of the public enemy. Story on Bailments, secs. 489, 490, and following.

5. The clause in the bill of lading which excuses the carrier on account of "the unavoidable dangers of the river," is more comprehensive than the exemption recognized by the common law of "the act of God." McArthur vs. Sears, 21 Wend., 190; Gordon vs. Buchanan, 5 Yerger, 71; Turney vs. Wilson, 7 Yerger, 340; Johnson vs. Friar, 4 Yerger, 48.

After these preliminary points, it is insisted, that a common carrier, who has no other exemption than that provided by the common law, is excused by the act of God, where it produces the loss independent of his default, and that the carrier who, by bill of lading, is exempted from responsibility on account of the dangers of the river, is excused when the loss is produced by the dangers of the river independent of any default on his part. Story on Bailments, sec. 413, a, to 413, d, 515; 11 Pick., 41, 43, 44; Hart vs. Allen & Grant, 2 Watts R., 114.

That the bill of lading, signed by a carrier, exempting him from loss by the dangers of the river, is to be construed with reference to the navigation to which it applies and the dangers incident to that navigation, and therefore the striking of a boat upon a bar or snag in the Missouri or Mississippi rivers known to navigators, does not render the carrier liable unless he can show that it was by the act of God.

## GEYER, *for Appellee.*

1. The appellants are common carriers and subject to their liabilities. As carriers, they are insurers against every loss of, or injury to property entrusted to their care, except such as are inevitable or such as arise from the act of God or the public enemy. Daggett & Price vs. Shaw, 3 Mo. R., 189; Pomeroy vs. Donaldson, 5 Mo. R., 36; Hastings vs. Pepper, 11 Pick., 41; Elliott vs. Rossell, 10 Johns. R., 1; Richards vs. Gilbert, 5 Day, 415; Jones vs. Walker, 5 Yerger, 427; Emory vs. Hersey, 4 Greenleaf's R., 411; Forward vs. Pittard, 1 T. R., 27; Riley vs. Horne, 5 Bing., 217; Clark vs. Richards, 1 Cox, 54; Story on Bailments, sec. 490-1. The exception in the bill of lading of the perils of the river, is nothing more than an exception of losses by inevitable accident. Perils of the river are only the natural accidents peculiar to river navigation, such as do not happen by the intervention of man, nor are to be prevented by human skill or prudence—but a loss happening in spite of human effort and sagacity, (3 Kent's Com., sec. 47, p. 215) which cannot be guarded against by the ordinary exertions of skill and prudence. Hence, where a loss occurs by a peril of the river which might have been avoided by the exertion of reasonable skill and diligence, it is not a loss by a peril of the river which will exempt the carrier. Story on Bailment, sec. 512; Kent's Com., 3rd vol., sec. 47, p. 217; Williams vs. Branen, 1 Murphy, 417; 1 Car. Law Rep., 224; Spencer vs. Dagget, 2 Vern., 92; Abbot on Shipping, pt. 3, ch. 4, sec. 6; Phil. Ins., ch. 13, sec. 7; The William, 6 Robinson, 316; Kemp vs. Conglily, 11 J. R., 107.

*Geo. Collier, et al, vs. Chas. H. Valentine, who sues to the use of the St. Louis Insurance Company.*

2. The defendants below are liable for injuries resulting from their own negligence or the negligence, unskilfulness or rashness of the master, officers and crew, or from defects in the means of transportation. The non-delivery of the goods having been proved by the appellee, the burden of accounting for them was thrown upon the appellants. In order to exempt themselves from liability, they were bound to prove that no care could have prevented the loss. Turney vs. Wilson, 7 Yerger, 340; Murphy vs. Slater, 3 Munf., 239; Ewart vs. Street, 2nd Bailey, 157; 2 Bailey, 421.

3. If it be assumed that the manner of the loss, as proved by the appellants, *prima facie* discharges them, that ground of defence is met by proving negligence, misconduct, or defective means of transportation. It is clearly shown that the master attempted to pass a dangerous part of the river late in the evening, with defective means; that the bar and snag, on which the boat struck, were not of recent formation, but were well known to pilots generally, and to the master and pilot of the Oregon—thus establishing such negligence, rashness and defective means, as that without their co-operation, the loss might not have happened, which is sufficient to repel the defence set up. The plaintiff below was not bound to prove affirmatively that the negligence, rashness, unskilfulness or defect of means, did contribute to the loss, but only that one or more existed to such an extent that it may have contributed to the loss. The facts proved being sufficient to break the line of defence, the most that the appellants could claim is, that, if it appeared that the facts as proved could not have contributed to the loss, they were exempt. Lawrence vs. McGregor, Wright, 193; Bell vs. Reed, 4 Binney, 123; Reed vs. Dick, 8 Watts, 479; Williams, et al, vs. Grant, et al, 1 Conn., 487; Putnam vs. Wood, 3 Mass., 481; Campbell vs. Muse, Harper, 468; Ames vs. Stevens, 1 Strange, 128; 3 Kent's Com., p. 217; Story on Bailment, sec. 516; Gordon vs. Buchanan, 5 Yerger, 71; Ware vs. Gay, 11 Pick., 106; Steamboat Co. vs. Barn, Harper, 262; Spencer vs. Daggett, 2 Vernon, 92; 1 Smith's Leading Cases, page 182; Crosby vs. Fitch, 12 Conn., 410; 6 Bing., 716; Power vs. Mitchell, 3 Hill, 545; 21 Wend., 190.

4. The Oregon was unseaworthy at the time of her departure, and so continued until the time of the loss. Although it appears that steamboats have been navigated in safety with one wheel, it cannot be doubted that a steamboat with two engines, so constructed as to require one wheel to each engine, is not seaworthy with one defective wheel. The evidence on the subject is clear. It is admitted by the conduct of the master in his solicitude to obtain the consent of the underwriters to depart on the voyage—by the efforts made to prove an intention to remedy the defect—that the defect was such as might expose vessel and cargo to greater danger than they would otherwise have been exposed to, is equally clear. It is not enough that the loss might have happened if the boat had been complete in all things. (See authorities on last point.)

5. It is not contended by the appellee that any defect of means, however slight, renders the carrier liable for all losses; but where, as in this case, the defect is such as to expose the vessel to greater danger of loss, to render her less manageable in difficult places known to exist, it is conclusive that the loss might have been occasioned by such defect, and the appellee was not bound to prove that it contributed to the loss, nor could the appellants discharge themselves by showing that the defect did not contribute to the loss, because the departure with defective means of transportation, so as to expose the property on board to additional perils, was itself an act of negligence which rendered them liable for subsequent loss. It is so in the case of deviation. Lawrence vs. McGregor, Wright, 193; Walsh vs. Homer, 10 Mo. Rep., 7. Such defect discharges an insurer against the perils of the river from all liability for subsequent loss, although the immediate cause be a peril of the river.

If an action were brought on a policy for loss under similar circumstances, it would undoubtedly be held not to be a loss by a peril of the river, within the meaning of the policy. Can it be a loss within the exception of a bill of lading in the same words, and meaning the same in both instruments?

6. The fact, if proved, that the St. Louis Insurance Company adjusted the loss of Taylor and Ferguson, who had insured to cover their advances, and paid to them the loss in satisfaction of

their claim on Valentine, the appellee, is no bar to the action. The payment was not made in discharge of the carriers, and cannot release them from the liability. It is neither unlawful nor uncommon for underwriters to settle even with the insured, where a loss has been occasioned by the culpable act or negligence of another, even where the insurer is discharged; but it does not impair, much less defeat, the remedy against the party in default. Certainly, the most that the appellants could require, would be, to give the fact in evidence in mitigation of damages.

7. Although it should seem to the court that there are clauses in the instructions given which, when taken separately, or even some instructions, which are not strictly correct, yet, as the instructions given, as a whole, contain a correct exposition of the law of the case, the judgment ought not to be reversed. Neal vs. McKinstry, 7 Mo.-R., 128; Williams vs. Vanmeter, 8 Mo. R., 339; Hogel vs. Lindell, 10 Mo. R.—especially as the party complaining has sustained no injury thereby. Finney, et al, vs. Allen, 7 Mo. R., 419; Newman vs. Lawless, 6 do. 301.

It cannot be questioned that the boat departed on the voyage in an unseaworthy condition—the defects being such as to expose the cargo to peril—that such defects were known to exist, and might have been repaired—that the master rashly undertook, with the boat in a crippled condition, to pass a point of extraordinary difficulty, at twilight—that the existence of the bar and snag, on which the boat was lost, was known to the master and pilot—that when the boat struck, she was out of the channel, is proved by the pilot—that other vessels, under the control of more prudent and careful navigators, passed the same place in safety, both before and after the loss of the Oregon. These circumstances establish gross negligence on the part of those in control of the Oregon, if they do not show conclusively that the loss was occasioned solely by the unseaworthiness of the vessel, or the rashness, negligence or unskilfulness of those in charge.

Scott, J., *delivered the opinion of the Court.*

The principal question discussed in this case, is, whether if a steamboat not seaworthy, on which there is a contract of affreightment, departs on a voyage and is afterwards sunk, in an action against the owners for not providing proper means for safely carrying the cargo, the defendant can show as a defence that the loss was occasioned by a peril excepted in the contract, and was in no manner influenced by the defect of unseaworthiness, and that it would have happened, even had the boat been seaworthy? Had there been a policy on the cargo, it would not have admitted of a question, that there could have been no recovery upon it, as the boat not being seaworthy, the policy would never have attached, and of course no action could have been sustained against the underwriter. Hence, it was contended, that as the policy and the bill of lading were designed to indemnify the shipper against all perils, and as the bill of lading covers the perils not provided against by the policy, as there could have been no recovery against the underwriter on a policy, the carrier must be liable. If the action had been against the carrier for a loss of the policy by reason of its not attaching in consequence of the unseaworthiness of his boat, this argument might have been more appropriate, but the complaint is, that proper means were not employed to carry the

cargo, and the question is, whether the owner of the boat can show that the loss was not occasioned by the defectiveness of the means of conveyance.

There is no doubt of the general principle, that the owner is bound to see that the boat be seaworthy, which means, that she must be tight, staunch and strong, well furnished, manned, victualed and in all respects equipped in the usual manner for the trade in which she is engaged.— She must be adapted to the cargo and to the service in which she is employed. There is no such thing as absolute seaworthiness in the law. The term, "seaworthy," is a relative one and is always construed in reference to a voyage in which a vessel is to be engaged. The same vessel may be seaworthy for one voyage and entirely unseaworthy for another. That if any loss happens to a shipper in consequence of the neglect of the owner to furnish a suitable vessel, he is responsible for such loss, although the defect may be a latent one and unknown to him. He impliedly warrants that his vessel is suitable to the service in which he undertakes to employ her. That the ship owner like the common carrier is an insurer against everything but the excepted perils, which by the common law were the act of God, and the public enemy, though now by bills of lading the unavoidable perils of the sea or river, are excepted, a phrase which it has been held narrows the responsibility of common carriers more than it was by the common law. 21 Wend., 199.

Lord Holt, who was the first to define with precision the law regulating the liabilities of bailees, said, "that the rule with regard to common carriers was a politic establishment, contrived by the policy of the law for the safety of all persons, the necessity of whose affairs oblige them to trust those sorts of persons, that they may be safe in their ways of dealing, for else these carriers might have an opportunity of undoing all persons who had any dealings with them by combining with thieves and yet doing it in so clandestine a manner, as would not be possible to be discovered." Coggs vs. Bernard, 2 L. Ray., 919. This law then is founded not on principles of justice, but is supported by policy and convenience. Cases of such hardship frequently arise under it, as endanger the uniformity of its application. Under such circumstances, there seems to be no propriety in extending its operations beyond the reasons which caused its existence. A carrier ought to be liable for a loss occasioned by his default. But to hold him responsible for a loss by an excepted peril not at all attributable to the default, would seem to be great injustice.— If the master of a boat should be guilty of negligence and afterwards she should be stricken with lightning and consumed, would it not be extremely

hard to hold the owner ressonsible for the loss when it was so apparent that the disaster had no connexion with the event? With regard to policies, it has been held, that a temporary non compliance with the implied warranty of seaworthiness, when the policy has once attached, does not discharge the underwriters from a liability for all subsequent losses, where it distinctly appears that no damage or subsequent change of risk was occasioned by such non compliance. 1 Phillips on Ins., 332-3-4.

The question under discussion has rarely arisen and not much learning is to be found in the books in relation to it. So far as intimations of opinion have been given by Judges and elementary writers, their inclination has been in favor of admitting evidence, showing that the loss was independent of the default of the carrier.

Chancellor Kent says, if the master deviates unnecessarily from the usual course, and the cargo be injured by tempests during the deviation, the deviation is a sufficiently proximate cause of the loss to entitle the freighter to recover; though if it could be shown that the same loss not only *might* but *must* have happened, if there had not been any deviation, the conclusion might be otherwise. 3 Kent, 210. This doctrine of the Judges is founded on what fell from the Chief Justice in the case of Davis vs. Garnett, 6 Bing., 716. In that case, the plaintiff put on board defendants barge, lime, to be conveyed from the Midway to London. The master of the barge deviated unnecessarily from the usual course, and during the deviation a tempest wetted the lime, and the barge taking fire thereby, the whole was lost. It was held that the defendant was liable and the cause of loss sufficiently proximate to entitle the, plaintiff to recover. Tindal, C. J , in delivering the opinion of the court, in answer to the objection that there was no necessary connexion between the loss and the deviation, and that it might have happened had there been no deviation, said, "we think the real answer to this objection is, that no wrong doer can be allowed to apportion or qualify his own wrong; and that as a loss has actually happened whilst his wrongful act was in operation and force, and which is attributable to his wrongful act, he cannot set up as an answer to the action the bare possibility of a loss if his wrongful act had never been done. It might have admitted of a different construction, if he could show not only that the same loss *might* have happened, but that it *must* have happened if the act complained of had not been done." Judge Story, after noticing the distinction adopted in the Roman law which holds the bailee, who is *en mora*, liable for all losses by accident after his default, unless they are such as must have occurred to the thing bailed independently of the default, adds, that there

are certainly intimations in various common law authorities which lead to a similar conclusion.   Thus for example, he continues, "it has been said, that if goods are improperly stowed on the deck of a ship and they are washed away by the violence of a storm, the owner of a ship will be liable for the loss, although caused by the perils of the sea, unless the dangers were such as would equally have occasioned the loss, if the goods had been safely stowed under deck.   So, if the ship be not seaworthy, but the loss is caused by some peril of the sea or other casualty wholly disconnected with the want of seaworthiness, the carrier will not be liable for the loss."   Story on Bailments, sec. 413, d.   In the case of Hastings vs. Pepper, 11 Pick., 41, it was held that if a common carrier receives goods to be carried in a particular manner and position, he is bound to carry them in that way and if by a disregard of the directions, the goods are lost or damaged, the burden will be on him to prove that the loss was in no degree attributable to his breach of contract, but was occasioned solely by the act of God or a public enemy, or the act or fault of the owner himself.   The case of Hartt vs. Allen & Grant, 2 Watt's Rep., 114, decides the question now under consideration.   In that case, the jury was instructed in substance, that if they believed the boat was not fit for the voyage, or the master not competent or the crew insufficient, they ought to find a verdict for the plaintiff, whatever might be their opinion as to the real cause of the loss.   C. J. Gibson, who delivered the opinion of the court, which was a well considered one, observed, "that if the Judge had said no more than that the carrier is bound to provide a carriage or vessel in all respects adequate to the purpose, with a conductor or crew of competent skill or ability, and that failing in these particulars, though the loss be occasioned by the act of God, he shall not set up a providential calamity to protect himself against what *may* have arisen from his own folly," there would have been no room for an exception.   But, says he, "the cause was eventually put to the jury on a different principle.   That the want of seaworthiness has the peculiar effect of casting every loss from whatever cause on the carrier, as a penalty I presume, for his original delinquency and not for its actual or supposed instrumentality in contributing to the disaster, which is admitted to have been produced in this instance, by causes not connected with the unseaworthiness and to have been of a nature which no human force or sagacity could control.   Does such a penalty necessarily result from the nature of the contract ?   A carrier is answerable for the consequences of his negligence, not the abstract existence of it.   Where the goods have arrived safe, no action lies against him for an intervening but

unconsequential act of carelessness; nor can it be set up as a defence against the payment of freight; and for this plain reason, that the risk from it was all his own.    Why then should it in any other case, subject him to a loss which it did not contribute to produce, or give an advantage to one, who was not prejudiced by it ?    It would require much to reconcile to any principle of policy or justice, a measure of responsibility which would cast the burden of the loss on a carrier whose wagon had been snatched away by a whirldwind in crossing a bridge, merely because it had not been furnished with a proper cover or tilt, to protect the goods from the weather."

From these authorities we think we are warranted in holding that a carrier sued for a breach of a contract of affreightment, is permitted to show by way of defence, that although he may have been in default, yet that the loss was independent of that default, and *must* have happened although it had not ever existed.    But a delinquency which might have contributed to the disaster occasioning the loss, or negligence or carelessness at the time of its occurence, which might have had an agency in producing it, will render him liable.

The same considerations which are applicable to the cause of action in the first count of the declaration, will apply to the second count.    No points however, were raised on the instructions relative to the carelessness of the defendants, but as the second instruction cut off a defence to which the defendants were entitled according to what has been said, and as we see it may have influenced the finding of the jury, and indeed as the verdict may have been based upon it, the judgment must be reversed.

The eighth instruction relative to the running on a known snag or bar cannot be sustained.    Abbot in his work on Shipping, 258, says, "if a ship perish in consequence of striking against a rock or shallow, the cricumstances under which the event takes place must be ascertained in order to decide whether it happened by a peril of the sea or by the fault of the master.    If the situation of the rock or shallow is generally known, and the ship not forced upon it by adverse winds or tempest, the loss is to be imputed to the fault of the master.    On the other hand, if the ship is forced upon such rock or shallow by adverse winds or tempest, or if the shallow was occasioned by a sudden and recent collection of sand in a place where ships could before sail in safety, the loss is to be attributed to the act of God or the perils of the sea."    This is the doctrine in relation to Ocean navigation, where ships are furnished with maps and charts on which shoals and rocks are designated, and where there is ample room to avoid them.    But it is obvious, that this doctrine cannot apply to the navigation of our inland rivers, where a vessel cannot avoid a bar

or snag, and there is no other way but to pass over it. Where carelessness or rashness is imputed under such circumstances, every case must be determined by the facts of it. That a carrier may make himself liable for rashness or negligence occasioning a loss in passing such places, there is no question, and so it is equally clear that they may be passed under such circumstances as will exonerate him from all responsibility. The course usually pursued by skillful pilots in passing a bar or snag or dangerous place in the river, must be the test by which the propriety of the conduct of a carrier is to be ascertained. The frequent changes in the current of rivers, the rising and falling of their waters in such rapid succession, require the exertion of constant vigilance on his part and render it difficult to lay down any definite rule for the government of his conduct on the occasions referred to.

The other Judges concurring, the judgment will be reversed and the cause remanded.