Costigan v. Michael Transportation Co.

James Costigan, Respondent, v. Michael Transportation Company, Appellant.

St. Louis Court of Appeals, December 18, 1888.

1. **Common Carrier**: LOSS IN TRANSPORTATION: NEGLIGENCE. In an action against a steamboat and barge owner for the loss of ties in transportation, caused by the striking of a snag in the Mississippi river, where there was testimony to the effect that the existence and location of the snag were known to the pilot and captain, and to river-men generally, that a pilot should not run his boat up stream over that identical place, unless he knew positively that the snag had been removed, but the fact being that the snag had not shifted its place, a finding of negligence on the part of the carrier cannot be disturbed for the want of evidence in its support.

2. **Common Carrier**: LIABILTY: EXCEPTED PERILS. A common carrier is an insurer of goods entrusted to him for transportation. If loss or damage occur, he is liable, unless he shows affirmatively that it happened by reason of some cause or accident for which the law excuses him. The words " dangers of the river," or " unavoidable dangers of navigation," in a bill of lading, mean only the natural accidents incident to river navigation, and do not embrace such as may be avoided by the exercise of skill, judgment and foresight demanded of the carrier.

3. **Evidence**: IRRELEVANT. Evidence that the license of the pilot in charge has been revoked since the happening of the accident is irrelevant and inadmissible, when it does not appear that such revocation bore any relation to the accident or its causes.

*Appeal from the St. Louis City Circuit Court.*—Hon.
DANIEL DILLON, Judge.

REVERSED AND REMANDED.

*Campbell & Ryan*, for the appellant.

The judgment is without any evidence to support it,
and should, therefore, be reversed. *Schenck v. Sautler*,
73 Mo. 46. The rule is that a verdict in a law
action unsupported by any substantial evidence will
not be allowed to stand. *Avery v. Fitzgerald*, 94
Mo. 207–216; *Lionberger v. Pohlman*, 16 Mo. App. 392;
*Fischer v. Merchants' Co.*, 13 Mo. App. 133. It was
reversible error to admit testimony against defendant's
objection that, in the early part of 1888 (nearly a year
after the accident), the pilot of the vessel had gotten
into trouble through drunkenness. *Hipsley v. Railroad*,
88 Mo. 349; *Ely v. Railroad*, 77 Mo. 34; *Hayes v. Rail-
road*, 15 Mo. App. 584. And this rule applies, although
the case was tried by the court, sitting as a jury, as this
likely influenced its finding. *McDonald v. Matney*, 82
Mo. 358-366. It was error to permit plaintiff to bring out
on cross-examination of Little, and against defendant's
objection, testimony as to a conversation between Little,
the pilot, and Martin Michael, president of defendant,
had long after the accident occurred, to the effect that
the latter had charged the former with "having done
bad work"—"he ought not to be paid," etc. *Aldridge
v. Blast Co.*, 78 Mo. 559; *McDermott v. Railroad*, 73
Mo. 516; *Wengler v. Railroad*, 16 Mo. App. 493. The
judgment of the court was contrary to the instructions
given by it, and should, therefore, be reversed. There
was error in basing the italicized part of certain instruc-
tions given upon hypotheses not warranted by the evi-
dence. *Pepkin v. Haucke*, 15 Mo. App. 373. The court
erred in refusing the instructions asked by defendant and

in giving them in a modified form, also in giving plaintiff's instructions. By altering defendant's instructions the court made them its own. *Allen v. Mansfield*, 82 Mo. 688. The instructions as given by the court are inconsistent and contradictory, and the judgment cannot be allowed to stand. *Updike v. City*, 94 Mo. 234; *Pearce v. Railroad*, 77 Mo. 508-512; *Stevenson v. Hancock*, 72 Mo. 614; *Staples v. Town*, 69 Mo. 594; *Legg v. Johnson*, 23 Mo. App. 590.

*Rufus J. Delano*, for the respondent.

There was ample testimony to permit the trial court in its discretion to render a verdict for plaintiff, the rule of law being that the appellate court will not weigh the evidence nor interfere with the verdict when there is any evidence to support it. " Where there is no evidence to support a finding and judgment they will not be set aside because of introduction of incompetent testimony, to which no objection was made at the trial." *Christian v. Lademan*, 5 Mo. App. 594; *Naughton v. Stagg*, 4 Mo. App. 274. " Objections to evidence will not avail on appeal unless the grounds thereof were specified at time objections were made." *Primm v. Raboteau*, 56 Mo. 407; *Davis v. Hilton*, 17 Mo. App. 319; *Wayne Co. v. Railroad*, 66 Mo. 77; *Naughton v. Stagg*, 4 Mo. App. 274. The instructions given by the court were fair and consistent with the facts in evidence. " Defendant must make a case in which no neglect of its own appears, presumption is that goods were lost through carrier's negligence." *Kerby v. Adams Express Co.*, 2 Mo. App. 369; *Isenberg v. Steamboat*, 13 Mo. App. 415. In *Hill v. Sturgeon*, 28 Mo. 323, the condition in that bill of lading, " dangers of navigation," was even more favorable to defendant than in ours, viz., " unavoidable dangers," etc. In that same case, the court says, "all human agency must be excluded, and do not embrace accidents

such as may be avoided by the exercise of that skill, care, judgment or foresight which are demanded from persons in a particular occupation." The duty of the carrier if he enters into the contract ( he knowing what might happen ) is continuous until the goods are delivered to plaintiff. *Isenberg v. Steamboat*, 13 Mo. App. 415 ; *Steamboat v. King*, 12 Mo. 278.

PEERS, J., delivered the opinion of the court.

This is an action against the defendant as a common carrier for failure to deliver all the goods of the consignor entrusted to its charge. The petition alleges the incorporation of the defendant, and that on the fourteenth of May, 1887, plaintiff delivered to the defendant, near the mouth of the Big Muddy river, for transportation to St. Louis, forty-seven hundred railroad crossties, agreeing to pay defendant for their transportation and delivery at the rate of ten cents per tie, and received defendant's bill of lading therefor ; that the defendant failed to deliver fourteen hundred of the ties of the value of forty-eight cents each, and concludes with a prayer for judgment for six hundred and seventy-two dollars against the defendant company and defendant Martin Michael.

The answer of the company was, first, a general denial of all allegations not afterwards admitted, and further answers in substance, that it owned the seaworthy steamer " Mary M. Michael," and seaworthy barge " Freihaut" and contracted in writing with plaintiff to carry on said barge forty-seven hundred ties from Big Muddy river, Illinois, to St. Louis, Mo., " the unavoidable dangers of navigation, fire, explosion and collision excepted ; " that the steamer and barge started up the river on May 14, 1887, fully manned, equipped and provided for the voyage ; that on May 16, 1887, about one o'clock A. M., while the steamer was on said voyage and in the channel of the river at a point

opposite Lilly's landing, the barge "Freihaut" was sunk by coming in contact with a snag in the river; that the snagging and sinking of the barge were not due to any want of care or skill on the part of those managing the steamer and barge, but was wholly due to the collision with the snag which could not be seen or avoided; that the loss of the barge was due to unavoidable danger of navigation excepted from in the bill of lading; that when the barge sunk the ties floated off in the river and were carried away by the current; that in spite of every effort made by defend ant that could have been made to save and recover same 1,253 ties were lost; that defendant recovered the remainder, 3,447, and delivered them to plaintiff at St. Louis.

For a first counter-claim defendant alleges the same facts as to the contract and accident, and alleges that when the ties were floated off the barge at the time it sunk it became necessary for defendant, acting for the best interest of plaintiff, with whom it could not communicate, to employ men to catch and restore 3,437 of said ties at a cost of two cents each, and it paid said men therefor $68.74. It also was compelled to hire the barge "Pike" and pay it ten dollars per day for six days' use in loading and carrying said ties to St. Louis; that defendant's steamer was necessarily engaged three days in said service at a cost to defendant of two hundred and twenty-five dollars, in all amounting to $353.74, necessarily expended by defendant in recovering the lost ties, for which it prayed judgment.

For a second counter-claim it said that, in June, 1887, at rates set forth in account "B" at plaintiff's instance and request, it carried certai n ties from Neeley's landing to St. Louis at price of ten cents per tie, and paid certain charges and towed certain barges for plaintiff, and that there is due therefor ninety-five dollars for which it prayed judgment.

A reply was filed denying the new matter set up in the answer.

The answer admitted the loss of the ties, and setting up the sole defense that the snag was an unavoidable danger of navigation, narrows the issue down as to whether defendant, or its agents or officers were guilty of negligence or want of reasonable care, forethought, skill or prudence in avoiding the snag.

The testimony in chief tended to show the delivery of the ties to the defendant, the contract price agreed upon for their transportation, the bill of lading, the failure of the company to deliver all the ties at the place of destination, and their market value, demand for payment and the failure of the company to make good the loss. There was also some evidence to the effect that the president of the company blamed the pilot in charge of the boat for the disaster. There was some correspondence between the parties, but as it is not material to the disposition of the case, we will not further notice it.

At the conclusion of the evidence in chief, the court gave an instruction that no recovery could be had against Martin Michael, but refused an instruction to that effect concerning the defendant company; of this ruling the defendant complains.

The testimony of the defendant was made up of many witnesses, and as their testimony is important we give the same almost in full. The first witness was John W. Little, the pilot in charge of the boat at the time of the accident. He had been a pilot and captain for forty years; was in charge of the boat when the accident occurred; boat and barge were both in good condition for the voyage; was at the wheel when the accident occurred; happened near Illinois shore while making crossing at Lilly's Landing; first he knew of danger was when lookout hallooed that there was a "break ahead"; immediately stopped boat and commenced backing; break is a roughness in the water

showing an obstruction ; barge struck snag about half a minute after lookout hallooed ; it was so quick boat's headway had not run out ; was a hazy night ; the usual precautions in running steamboats up river where there is any doubt is to take the lead and work slow ; was working slow ; snag struck barge just above larboard knuckle, that is lower part of barge ; barge reared up on snag ; backed her off snag and tried to float her to the bar, but before she could be got there she sank ; pulled in all the ties we could and built a boom around the barge to save the ties ; steamer came to St. Louis leaving one or two men with the "Freihaut" ; got another barge, the "Pike," at once returned to the wreck ; it took from one evening till noon next day to get the ties on the "Pike" ; they used the "Pike" three days ; the snag was under water in the channel ; could not see it in time to avoid it ; had passed over the place going down in early part of May, about four o'clock in the day ; no snag was then visible ; man had just hallooed "mark twain" before we struck ; did all we could to avoid the accident ; we took the usual precautions to sound the lead and work slow and keep a man on lookout ; the mate was on watch on forward part of steamer. He had had trouble with other boats ; license had been revoked once in 1888.

Several days after the accident he was paid off by Michael and the latter used hard words to him and said it was bad work ; that he ought not to pay but would do so. Did not see snag on down trip ; young Michael was captain of the boat ; there was some doubt of their passage and we worked slow ; had been in doubt long time but never could tell where or when it was going to be ; channel was about one hundred and twenty yards wide ; snag was to left of boat ; we tried to get divers ; some ties slipped off when the barge struck ; we left barge when we came to St. Louis right abreast of where she

sunk; a man went out in a skiff to catch the ties; witness and captain looked out for snags on down trip but saw none; made up their minds there were none there.

John Kock: Laborer on river; was on the barge Freihaut, heard deck-hand on forward part of barge singing out "mark twain" and "break ahead"; the cries were about the same time; I hallooed, stop her; barge then struck; she struck right after the lookout hallooed; snag struck bow of barge; she sunk in a minute or two; some ties, don't know—many—floated off; could not count the ties that were lost; saved all we could; put a boom around the barge; put planks down, and put ties on top of them to bear them down and keep the ties from floating off; had passed over that place often before, but never saw the snag.

John Lare: River-man, was on the "Freihaut" when she sunk; heard deck-hand sing out "mark twain", and then at once "break ahead", and in about a minute the barge sunk; don't know if boat stopped; was trying to get off barge; could not see the snag; don't know if ties fell off; did not have time to look; just had time to get off the barge; might have passed snags and not seen them; was in the shanty on the "Freihaut" when I heard the lookout shout; I got out and onto the boat; I knew the man was in front on the barge, because I heard him; ties were five feet above deck.

John E. Leubben: Pilot on "Dolphin;" owned by Dolphin Transportation Company; Little is a good pilot; works with witness on the Dolphin; knew the "Freihaut;" knew Kennett's crossing; passed down few days before accident; did not see that snag at that time, it was not visible; sunken snags are among the dangers of navigation; it often happens that a vessel strikes a snag; would not say a pilot was negligent because he struck an unseen snag coming up river in middle of night.

Cross-examination :   Snag had been there for five or six weeks ; the snag pointed down stream ; was quite large ; sometimes it stuck out, sometimes it didn't.   A snag moves its position from one place to another ; time and again witness passed here without seeing it ; boats will ride over it down stream, and then water will push it up ; this was a tree ; when boats ride it down there is no danger ; this snag was pretty well known by pilots ; if I thought snag was there would try to avoid it; never ran into it, but ran very close to it ; channel was, perhaps, two hundred or three hundred yards wide—hard to tell ; have passed boats near and below there ; don't know that he ever passed once right there ; there was not much room to spare ; snag is in channel toward Missouri side. Could not hug Illinois shore, because it was dangerous ; the Michael and two barges were each about thirty feet wide ; snag was there, perhaps, in March ; snags shift position, sometimes fifty yards, sometimes half a mile between trips ; there were other snags toward the shore ; it was a bad shore, that is, the Illinois shore ; the usual precautions of a tow-boat in bad places is to have a man on lookout and to go slow; don't lay up at night because of snags.

Captain Michael :   President of company ; there were twelve men in the Michael crew ; knew the pilot Little forty years ; never heard of him in an accident ; was not on the steamer at time of accident ; the market value of ties in St. Louis at time these were to have been delivered here was forty to forty-five cents ; when heard of accident, looked for a barge ; Costigan ( plaintiff ) did not live here ; had difficulty in communicating with him ; I could not reach or write to him without delay ; paid ten dollars a day for use of barge " Pike ; " used her six days from time I got her until ties were unloaded here by consignee ; the ties were boomed as well as could be ; some may have slipped away ; employed twenty or twenty-two men to go down and get the ties ; they were

necessary, as it had to be done as quick as possible; paid $68.74 to these men, a reasonable price; paid for barge sixty dollars; charged seventy-five dollars per day for three days' use of the Michael; usually charge one hundred dollars to one hundred and twenty-five; she was used in saving the ties and towing them to St. Louis; the agreed freight was $405.80, that is, ten cents each for 4,058 ties; paid eight dollars charges on the ties; Costigan agreed to pay one hundred and seventy-five dollars for towing barge St. James from St. Louis to Big Muddy and back, and barge S. C. Baker twenty-five dollars; we had to wait in June twice, once forty-eight hours, once five hours, and plaintiff agreed to pay one hundred dollars therefor; the amount of ninety-five dollars claimed, seems to have been paid by Costigan by check; no part of the $353.72 on first account has been paid; may have said I ought not to pay pilot for sinking the barge; did not say accident was caused by pilot's negligence. Costigan paid for bringing the ties here; after we got ties here Costigan came down to St. Louis; some of the ties may have slipped under boom; they were boomed with heavy stage-planks; the swell caused by the steamer may have floated a few away; I discharged the pilot; I did not like losing a barge worth fifteen hundred dollars; I paid Little off; we had no use for him as we laid up the boat.

John M. Little recalled: His license had never been revoked; had been suspended once for ninety days. Was not under influence of liquor when accident happened.

Peter Michael: Licensed captain and pilot, running for eight years between St. Louis and Cairo on the Mary Michael; was familiar with river; captain of Michael at time of accident; had two barges in tow, one of piles and one of ties, one barge on each side of boat and extended about two-thirds of their length ahead; they were about one hundred and fifty feet long; the Michael was about

one hundred and fifty feet long, Freihaut was on larboard (left) side; accident happened about one A. M.; had been two days on the way; had gone to bed; heard hallooing; ran out; deck-hand said barge was sinking; told pilot to shove her on bar; barge was filling fast; tilted and dropped some ties; were in nine or ten feet of water; barge raised the snag; latter broke barge down; after the snag struck I saw it above water; don't think barge was three minutes sinking; put boom around barge and weighted the ties down; left two men; did all they could; sent a man by rail to St. Louis to notify Capt. Michael; went back with "Pike;" got ties; we unloaded about thirty-four hundred and fifty ties at St. Louis; had sixteen or eighteen extra men at work; went down about eight days before the accident; did not see the snag, although we looked out for it. Signed bill of lading for forty-seven hundred ties; Costigan paid for carrying forty-three hundred; was asleep at the time of accident; went off watch and to bed about one o'clock; Davis took his place on watch and was in charge; had seen snag there for six or eight weeks or longer; possibly there since fall of 1886; a good-sized snag—a tree; it was in the channel. River perhaps two-thirds of a mile from shore to shore; middle bars there; bar to which they took barge after accident was on Missouri side of channel; water running over snag makes a ripple; had seen head of snag before; all the ties lost were lost right at time of accident; about twelve hundred were lost then; running about four miles an hour; it was cloudy but not a bad night; could see the water; was wakened by the barge striking; snag was about eighteen inches at top; a big tree, roots were lodged in the sand; did not count ties when we left barge; delivered few over thirty-four hundred at St. Louis; about twelve hundred were lost. Boat was stopped when witness got up after crash; Mr. Costigan only paid freight for the ties delivered in St. Louis, that is, thirty-four hundred; the snag was

under water on our down trip eight days before ; you could not tell snag was there at night, but could in daytime by the ripple in water.

The following witnesses testified in rebuttal :

W. B. Chapman :   River pilot for twenty-five years ; knew there was a snag in crossing at Kennet Castle in spring of 1887 ; it had been there several months before accident ; was a medium size snag—a tree—pointing down stream ; river was eight to ten feet deep at that point ; channel was seventy-five to one hundred yards wide ; ran large steamer over crossing without accident ; there was room for Michael and tow to go through without striking ; I noticed snag on down trip ; it had been ridden over by a down boat ; I noticed it up again after the accident ; snag was known to river-men before accident ; Little was on river before witness. Knew Little twenty years ; Little was known among river-men for that length of time as a competent, careful and reliable pilot ; had been running all spring of 1887 ; about May 9, 1887, witness had passed the place on down trip ; snag was not visible so far as we could then see there ; was no snag in river at that time and place ; on the seventeenth we came up ;  barge was lying below snag straight with the current ; saw ties on her ; did not notice men ; had noticed floating ties about fifteen miles below ; snag was then sticking out of water ; witness' impression was the barge had forced it from beneath surface of water until it projected eighteen inches above ; snag was on the Missouri side of channel ; water on both sides ; we ran above the snag ; there was ten feet of water where snag was ; water was less toward Missouri side, and it was same on other side of channel toward Illinois shore ; the best water in channel was between Illinois side just beyond the snag toward Missouri side ; channel quartered across river coming up from Illinois to Missouri side, and going from Missouri to Illinois side ; best water was between Illinois side and across beyond snag ;

channel had been right where snag was but was leaving there ; had met boats abreast in that channel with safety ; snags can be rode down and rise again ; knowing a snag in river would not think it safe to run boat over or against it even under water ; if a snag had been seen a short time it would not be prudent ; don't say Little was careless in handling the Michael, as the method of handling depends altogether on circumstances, and that must be left to the man at the wheel ; would say Capt. Little with his experience would know best what to do in handling such a vessel as the Michael and her tow ; witness knowing Little would say he would handle and guide the boat properly and correctly, and believe he was competent to handle that tow on that night ; witness would have relied on Little that night in the management of the vessel.

Joseph Dryden : Pilot for sixteen years between St. Louis and Cairo ; saw barge above Perry's tow-head on middle bar in spring of 1887 ;. had talk with Capt. Michael about the accident ; don't remember date ; witness Michael and Costigan were present ; Capt. Michael said, "if I had been on boat," or something of that kind, "the accident would not have occurred ;" didn't hear him say anything about Little ; that if he had not been there it would not have happened ; told Capt. Michael he had seen fifty or sixty ties about Ste. Genevieve Bend ; he and Costigan were talking of going after the ties ; there is a snag in that crossing ; it has been there all through the season ; don't know when he first noticed it ; judges it was there before accident five or six weeks ; stuck up above water eighteen inches—a large snag ; it was anchored in twelve feet of water ; boat could run over it going down river ; I think it was run over ; it had that appearance the trip before ; witness always ran close to the snag ; in going down the trip before the accident witness could not see it, only track of it ; coming up saw it ; occurred to witness that the barge

striking the snag had raised it; not safe to strike a snag going up stream, coming up turned light on sunken barge; we have a head-light; navigation laws do not require it; head-lights are not usual; barge was lying on beam ends; it had listed to one side; could not say whether or not ties could be kept from floating off—depends on circumstances. Snag was under water on last trip of witness before accident; snag was right in place where boats had to pass going up and down; coming up after accident saw snag sticking out and thought barge did it.

The defendant asked the court to give the following instructions, which were refused in the form tendered, but were mostly given in a modified form, afterwards by the court:

"1. The court declares the law to be that, under the pleadings and all the evidence in the case, the plaintiff is not entitled to recover.

"2. The court declares the law to be that, under the pleadings and evidence, there must be a judgment in favor of defendant, the Michael Transportation Company, upon the first counter-claim in an amount not exceeding the amount claimed in the petition, with interest thereon from judicial demand, amounting in all to the sum of $——.

"3. The court declares the law to be that a snag sunken in the channel of the river is a danger to navigation.

"4. The court declares the law to be that, under all the evidence and pleading in this case, the sinking of the barge Freihaut, and the loss of plaintiff's ties as a result thereof, was not due to any want of reasonable skill and attention on the part of defendant's servants having charge of said barge and ties.

"5. If it appears from the evidence that any of the ties mentioned in the petition were lost by reason of the sinking of the barge upon which they were laden,

by coming into contact with a snag in the river, and it also appears that said snag was sunk under the water and was not visible, and was in the channel of the river for boats and tows ascending the river, and that only a few days before the pilot of defendant's vessel on his way down looked for said snag and could not find it, and that in coming up the river a few days thereafter, on the trip when said barge was sunk, he ran defendant's vessel and her tow slowly and cautiously over said river, and had men to sound the depth of the water stationed on the head of the barge in advance of the head of the steamer as a lookout, and that said man was performing such duty and notified the pilot of a break ahead, and that said boat was stopped and backed, but was so close upon said break of said snag as to render it impossible to avoid striking it, then the court declares the law that defendant is not liable for the loss of any of said ties lost by reason of this accident to said barge."

Plaintiff's instructions, given as modified by the court, are as follows :

" 1. The court declares the law to be that, if the defendant Michael Transportation Company did not deliver to plaintiff or his agents at St. Louis all of the railroad ties placed in its charge or custody to be transported by it from the mouth of the Big Muddy to the city of St. Louis, and that the failure to deliver all of said railroad ties was caused by the want of ordinary or reasonable care, skill and attention on the part of defendant or its agents, especially intrusted with the control and management of said property during its transit on the Mississippi river from its starting point to its final destination, taking into consideration the character of the goods, the time and character of the night, and the anticipation of all dangers of navigation on said river that should reasonably have beeen anticipated, including a possibility of running into a snag, either hidden or in sight, and known of by defendant, its officers or agents, then the plaintiff is entitled to a judgment.

"2.  The court declares the law to be, that defendant is a carrier of plaintiff's goods for hire, and that in the care and custody of said goods it is bound to use all reasonable care, skill and attention and diligence to conduct it safely to its destination ; that it was the duty of said defendant carrier to place said goods in charge of competent and careful agents or employes ; and if the jury find from the evidence that the agents and employes so placed in charge neglected and failed to exercise all ordinary care, prudence and watchfulness, so as to avoid, if possible, all the dangers of navigation on said river, and that said accident and loss to plaintiff was occasioned by the failure on part of defendant's agents or employes to perform their said duties, then the plaintiff is entitled to a verdict.

"3.  The court declares the law to be that if it render a judgment in plaintiff's favor, it should render a judgment for the amount it shall find from the evidence that he has been damaged by defendant's failure to deliver said ties ; and in making up said amount it should take into consideration the number of ties that defendant failed to deliver to plaintiff, his agents or purchasers at St. Louis, at their market value in St. Louis, at the time when they should have been delivered, less the amount of ten cents per tie ( freightage on each one not delivered ), to which court may add six per cent. interest from date of commencement of action."

The court then modified defendant's instructions numbered three and five and gave them as follows :

"3.  The court declares the law to be that a snag, sunken in the channel of the river is a danger of navigation, if its existence or position is not well known to people whose business it is to navigate said river or carry on a transportation business thereon.

"5.  If it appears from the evidence that any of the ties mentioned in the petition were lost by reason of

the sinking of the barge upon which they were laden by coming in contact with a snag in the river ; and if it also appears that said snag was sunk under the water and was not visible, and was in the channel of the river for boats and tows ascending the river, and that only a few days before the pilot of defendant's vessel on his way down looked for said snag and could not find it, and that in coming up the river a few days thereafter, on the trip when said barge was sunk, he ran defendant's vessel and her tow slowly and cautiously over said river, and had men to sound the depth of the water stationed on the head of the barge in advance of the head of the steamer as a lookout, and that said man was performing such duty and notified the pilot of a break ahead, and that said boat was immediately stopped and backed, but was so close upon said break of said snag as to render it impossible to avoid striking it, then the court declares the law to be that defendant is not liable for the loss of any of said ties lost by reason of this accident to said barge, unless the court believes that said pilot and other officers of said boat had known for a long time that said snag was in said river at the place where said barge struck it, and had had no knowledge or assurance previous to said barge striking said snag that said snag had been removed or that it was no longer in the river at that point."

The court gave the following instructions asked by defendant :

"4. And the court further declares the law to be that, if it appears from the evidence that the ties mentioned in the petition, or any part thereof, were lost by reason of the barge Freihaut having come into collision with a sunken snag in the channel of the river, while prosecuting her voyage to St. Louis from the point of shipment, then under the terms of the bill of lading mentioned in the petition, the ties, or such portion of them as were thus lost, were lost by reason of a danger of

navigation, and unless it appears from the evidence that the snagging of said barge might have been avoided by the exercise of reasonable skill, care and attention on the part of defendant, the Michael Transportation Company, or its servants, then the defendant is not liable for such ties so lost.

"5.   The court declares the law to be that, if it appears from the evidence that the ties, or any part of them, were lost by reason of the barge upon which they were laden being sunk by coming in contact with a snag sunken under the water in the channel of the river while said barge was in the prosecution of her voyage to St. Louis, that then the burden of proof rests upon plaintiff to show clearly that defendant or its servants were guilty of negligence, and that the loss of said ties was due to a failure on the part of defendant to exercise reasonable skill and care in avoiding the injury to the barge ; and unless the evidence shows such want of skill and care the defendant, under the terms of its bill of lading, is not liable for such ties as may appear from the evidence to have been lost.

"6.   If it appears from the evidence that the barge upon which plaintiff's ties mentioned in the petition were being carried by defendant was sunk in the Mississippi river, while on the voyage from the place of shipment to the place of destination, by a sunken snag in the channel of the river, and that the striking of said snag by said barge could not have been avoided by the exercise of reasonable skill and attention on the part of defendant's servants employed in their conveyance, and that by reason of said accident to said barge the defendant could not proceed with said ties on the voyage, and that said barge could not have been raised, and that defendant had no means of communicating with plaintiff without risking the loss of said ties on said barge, then it was the duty of defendant to procure another vessel upon which to load them and carry them to their

destination, and defendant is entitled to charge the additional expense of the hire of said new vessel or barge, and of saving said ties, to the plaintiff; and if it appears from the evidence that such expenses were so incurred for such purpose, and that they were reasonable and necessary to the preservation and carriage of said ties, then, under the law, there must be a judgment for defendant upon its first counter-claim, in such sum not exceeding the sum claimed in said counter-claim as under the evidence is shown to have been so reasonably and necessarily expended in saving and forwarding said ties to their destination.''

The errors complained of are (1) as to the admission and rejection of testimony; (2) the giving and refusing of instructions; and (3) the judgment is without evidence to support it.

The latter proposition is relied upon chiefly, both in the argument before us and in the brief filed by the defendants. They insist that the judgment is not only against the evidence, but is without any evidence to support it.

This being the main question, we will leave the regular order of errors assigned and dispose of it first.

I. This court has uniformly held that a judgment will not be reversed because a verdict is against the weight of evidence. Nor will we examine a record to determine where the weight of evidence lies, the rule being that where there is substantial evidence in the record to support the finding, the judgment will be affirmed; but we have never held that a judgment will be affirmed where there is *no evidence* to support it. A careful examination of this record is necessary to the proper determination of this question. We have, therefore, looked into this matter with much patience and care, scrutinizing all of the testimony, and while the same is not as positive, pointed and clear as we would like to see, yet we are not prepared to hold that there

is no substantial evidence to uphold the verdict and judgment. The testimony of the witness Luebben alone goes a long way in support of the verdict, when he says that the "snag had been there at that place for two or three months prior to the accident; that this snag was well known by pilots and river-men, and that it was to be avoided; that a pilot should not run his boat up-stream over that identical place unless he knew positively that the snag had been removed." "That this snag stayed where it was; that it did not shift, and that there were no other snags at that crossing." The pilot in charge evidently knew of the existence of this snag, for on the down-trip, seven or eight days previous to the accident, he drew the attention of the captain of the boat to it, asking him, "do you see the snag?"

The only inference to be drawn from the testimony of Capt. Michael, president and chief stockholder of the defendant, is, that the accident was attributable to the negligence and carelessness of the pilot in charge of the boat.

The captain in charge of the boat and the person who signed the bill of lading shows absolute previous knowledge of the snag, and yet, when the accident occurred, he was in bed. He was informed of the dangerous character of the river at this point, and such knowledge should have led him to be on guard, with more than ordinary care, until the danger point had been passed. His failure in this respect, while not conclusive by any means, yet, when taken in connection with the other testimony, justified the trial court in finding for the plaintiff on the question of negligence. We will not interfere on this ground with the finding of the trial court.

II. It is urged that the judgment of the trial court is contrary to the instructions given by it, and not warranted by the evidence; and further, that the instructions are inconsistent and contradictory. It is very well

settled that the giving of instructions "covering the entire case, and which are so contradictory in part as to be irreconcilable, is error for which the judgment must be reversed." *Legg v. Johnson*, 23 Mo. App. 590. We do not see, however, that these instructions come within the rule as laid down in *Legg v. Johnson, supra.*

On the contrary, taken as a whole, the instructions seem to be entirely fair and consistent with the facts in evidence. They appear to have been drawn under the decision of the supreme court in the case of *Hill v. Sturgeon*, 28 Mo. 323, where it is said : "A common carrier is an insurer of goods entrusted to him for transportation ; if loss or damage occur, he is liable unless he shows affirmatively that it happened by reason of some cause or accident for which the law excuses him. The *onus* being upon the carrier, he will not be discharged from liability by showing that the navigation was difficult or dangerous, or that he employed skilful or competent persons to control or manage the boat ; he must show that the loss occurred in a manner and for a cause that will acquit him."

"The words 'dangers of the river' or 'unavoidable dangers of navigation' in a bill of lading mean only the natural accidents incident to river navigation and do not embrace such as may be avoided by the exercise of skill, judgment and foresight demanded of the carrier." *Ib.*

"If, at the time of a disaster and consequent damage or loss of goods in charge of a carrier, he is guilty of some delinquency, as by having an incompetent pilot in charge of the boat, if such delinquency *might* have contributed to the disaster, or might have had an agency in producing it, he will be liable ; he may, however, show by way of defense that the disaster *must* have occurred, although the delinquency had never existed." *Collier v. Valentine*, 11 Mo. 309. These instructions

VOL. xxxiii—19

are bottomed on the principles laid down in these cases, and being entirely fair to the defendant, we fail to see wherein good ground exists for complaint against them.

"Valuable property is committed (says a learned judge) to the diligence and skill of the owners and officers of steamboats and other vessels, and as the public have no means of knowing whether the boat is safe or whether the officers are competent for their places, their only security is in the vigor of the law and its faithful administration, which hold the carrier to a severe responsibility. He should not be allowed to trifle with the lives and property of others by risking either in unsafe crafts, or by committing them to the mercy of negligent or incompetent officers. And if, at the time the loss happens, the carrier is in the omission of a duty or in the act of doing anything improper, and the omission or act *might* have had an agency in causing the damage, he ought not to be permitted to impute to the elements in the dangers of navigation a disaster which may have been the result of his own conduct." This is strong language, and yet I have no hesitancy in subscribing to the principle therein enunciated, and applying the same to the instructions as given in this case, we cannot see that the court has committed error therein.

III.    The third proposition relates to the admission of evidence of the suspension of Little, the pilot, in February, 1888, after this accident occurred. The pilot is asked : "Did you have any license cancelled ? Yes, sir. When ? Last winter." This might have been proper enough on cross-examination, but, when the answer of the witness discloses that this was subsequent to the date of the accident, and not connected with it in any manner, the court should have sustained the objection, on the ground of its not being material. There is some evidence of negligence in the case, but it is far from persuasive, and it is not unlikely that evidence irrelevant in its character may have turned the scale.

Carr v. Union Mutual Fire Ins. Co.

On looking at the record, I find that this line of examination was objected to at the outset by the defendant on the ground that it was immaterial; that the objection was overruled and an exception saved. It is true that the objections were not renewed with each subsequent question; but I suppose that to be unnecessary. *Stephens v. Brown*, 12 Brad. (Ill.) 619. It is true that the defendant reëxamined the witness on this point, with the view of showing that his license had not been cancelled, but that he had merely been suspended. But I do not understand that, where irrelevant and harmful testimony has been admitted over an objection of a party and he has saved an exception thereto, he waives his exception by putting further questions to the witness on the same subject with the view of breaking, as far as possible, the harmful tendency of the evidence which has thus been admitted.

The admission of this evidence leads to a reversal of the judgment and remanding the cause. All the judges concurring, it is so ordered.